IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA

V.                                         1:11cr00456-1

MARCELLO CAPONE                            Judge Eric N. Vitaliano
         Defendant                         Sentencing Date: May 29, 2012


**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING AND MOTION FOR VARIANCE FROM THE ADVISORY USSG PURSUANT TO THE "FAST TRACK" POLICY DIRECTIVES NOW NATIONAL IN SCOPE FOR ILLEGAL RENTRY AFTER REMOVAL CASES**


COMES NOW, Marcello Capone, by and through his attorney, John T. Riely and submits this memorandum to aid the court in fashioning the appropriate sentence and by way of a motion for a variance in support of a downward departure from the guidelines and in support thereof refers this court as follows:


1.  Mr. Capone is scheduled to be sentenced by this court on May 29, 2012 after having entered a plea of guilt to one count on Attempting to Re-enter the U.S. after being Deported in violation of 8 USC §1362(a) and (b)(2).

2. Mr. Capone entered this plea after a full plea litany before this court on September 28,

   2011.   The plea was indeed entered on the day of trial and after jury selection had

   occurred but before opening statements were presented to that jury.[1]


3. Mr. Capone is now 46 years old.   He has lived most of his adult life in Italy, the country of

   his nativity, but he spent in formative and education years in the U.S.  on Long Island, after

   immigrating lawfully to the U.S. as a permanent resident (green card holder).


4. The facts that gave rise to the charges and plea have been well developed in the record at

   bar and were acknowledged during the plea litany.  Mr. Capone boarded an Air Italia flight

   in Milan, Italy and presented a valid Italian passport in his true name.   As an Italian citizen,

   Mr. Capone was ostensibly eligible to travel to the U.S. on the Visa Waiver Program and

   without having to make application for a visa at a U.S. consulate or embassy. [2]   Upon

   presenting his valid and true Italian passport bearing his true likeness and true identity to

   the U.S Customs and Border Patrol officials at New York's Kennedy Airport, Mr. Capone's

   true identity and past history was easily identified implicating the legal complications

   involved in his case.   The point Mr. Capone wishes to raise is that he presented valid

   documents and made true and accurate representation as to his identity when making

   application to enter the U.S. when he arrived on the Air Italia flight.  Once his identity was

---

[1] While this plea was entered on the day of trial, it did save the government considerable time and resources and further demonstrated an acceptance of responsibility, both factors taken into consideration under the Fast Track memo.
[2] As will be developed below, Mr. Capone's history precluded his eligibility under the visa waiver program but that does explain how he arrived at the port of entry at Kennedy Airport.

easily established, Mr. Capone was denied admission into the U.S., and these charges

ensued.


5.   It is likewise true that Mr. Capone was ordered deported from the U.S. to Italy.   Upon

information and belief, the defendant believes that the executed deportation or removal

order was executed sometime in late 1998.   At that point, Mr. Capone lost both his legal

status in the U.S. and his lawful permanent residency status in the U.S.  Mr. Capone

remained in Italy from that time until May, 2011, the date giving rise to the facts in the

indictment.  The underlying deportation was premised on criminal conduct which resulted

in convictions rendering Mr. Capone removable from the U.S. [3]  As an alien deported from

the U.S. and as one deported because of an underlying aggravated felony conviction, Mr.

Capone readily acknowledges that any subsequent attempts to enter the U.S. or entries in

the U.S., had to, as a matter of law, be preceded by an application to governmental officials

for permission to re-enter the U.S. as an alien previously deported from the U.S.   Had this

matter proceeded to trial, Mr. Capone would have offered by way of a defense that his

candid and truthful presentation to the Customs and Border Protection officers at JFK was

tantamount to an application for permission to reenter the U.S. [4] This is set forth by way of

mitigation of Mr. Capone's conduct as he clearly let the CBP officials know of his true

identity and was not acting without some responsibility for his conduct. [5]   Clearly, the

---

[3]  These convictions will be discussed in more detail below.
[4]  It is acknowledged that the regulatory or statutory scheme involving applications for permission to reentry after
deportation contemplates such application being made at the US Embassy or consulate and not at the US airport.
[5]  We are all the product of our experiences and the undersigned has had a number of re-entry after deportation
cases  in which the defendant's whereabouts became known and the fact of the prior deportation and subsequent

better practice would have been for Mr. Capone to have made application to the U.S.

consulate in Milan for permission to renter the U.S. after reentry.

6.   The PSI does set forth some criminal history for Mr. Capone.  Those convictions are

acknowledged.  Those same convictions however the court should note are of very old

vintage.  The criminal conviction for the sale of a controlled substance took place in Nassau

County, New York in 1988, twenty four years ago.    Mr. Capone was 20 years old.  Similarly,

the conviction for Possession of Stolen Property, also in Nassau County, New York in 1991 is

also ancient and is over 20 years ago.    The PSI correctly notes these offenses should not

impact the criminal history calculations under the Federal Sentencing Guidelines and that

the correct criminal history category should remain at I.

It is noted that the base level for re-entry after deportation is 8 under the USSG§ 2L1.2(a).

The fact that Mr. Capone attempted to re-enter after a conviction for the enumerated

convictions truly adds a tremendous addition onto the advisory guideline calculations.

Mr. Capone is being penalized very heavily and harshly for a 24 year old offense.   The court

is asked to take the age of this matter into consideration and the long passage of time

should be taken into consideration for this very old conviction which impacts dramatically

the advisory guideline calculations.

---

re-entry becomes known when the alien is arrested on the streets of Baltimore, Maryland or Washington, D.C
engaging in new substantive criminal conduct.   This is a far cry and of much more serious dimension than Mr.
Capone who was at the functional equivalent of the border, making application for entry and making known his
true identity and hence his true history.

7.   Mr. Capone went through a very rough patch in his late teenage years and early 20's as is evident from his criminal record.   Mr. Capone has acknowledged utilizing drug and controlled substances.   This episode in his life is now far behind him and is of twenty plus years duration.   Since his deportation to Italy, Mr. Capone has consistently maintained employment and he has dabbled in entrepreneurial adventures with a mixed record of success.   He has married and had a child.     The type of criminal conduct which is set forth in the PSI is of old vintage and has not been a part of his life for over two decades.

8.   Mr. Capone does have extensive in the greater New York metropolitan area.   They are all very supportive and loving of him.   The PSI accurately indicates that Mr. Capone's mother, father, brother and sister are all here.   They have written to the court and their letters and attachments are annexed as part of this pleading.   Mr. Capone does enjoy the love and support of a large, warm, and caring Italian family.  Mr. Capone's parents are quite aged. Mr. Capone does indeed have a son who lives in Long Island, N.Y.   Mr. Capone has not had much contact with his son.   Mr. Capone's motivation in boarding the plane in Milan, Italy and in travelling to the U.S. was to see these relatives and repair some of the bridges burnt over the years.     Simply put, Mr. Capone wanted to see his parents, now in their mid 70s, his brother and sisters, and his son.   Accordingly, while the government can criticize Mr. Capone for the means and methods of his manner in attempting to enter the U.S., his motivation in doing so was pure and was namely, to visit his mom, dad, sisters, brother and son.

9.  Mr. Capone denies that he had a bad relationship with his Italian wife, Dunja Sasovic.

While the marriage experienced some instability, Mr. Capone asserts that he was and

remains a loving husband and father and that he enjoys their support and their love.  He

also enjoys a solid relationship with his in-laws.


10.  The PSI accurately reports that Mr. Capone suffers from two afflictions: Celiac disease and a

Bi-Polar condition.   Both conditions have been brought to the attention of the US

Marshall's at the Brooklyn Detention Center, but the court should know that Mr. Capone

has suffered greatly during his one year of incarceration because of these conditions.  Both

conditions require medication and both conditions require constant vigilance.  The Bi-polar

condition helps explain why, intermittently, Mr. Capone has reacted aggressively and in

socially inappropriately on limited occasion.   Mr. Capone can be both alternatively

charming and engaging followed by periods of anger and poor judgment.   He has remained

medicated for most of his duration at the Brooklyn Metropolitan Detention Center.

Additionally,   Mr. Capone must eat a very monitored diet and takes a variety of

medicines under medical supervision to monitor his bi-polar condition.   Mr. Capone no

longer abuses other drugs and specifically he no longer uses cocaine or marihuana.


11.   Many federal district courts near the border have operated under "fast-track"

programs to process unlawful re-entry cases.  U.S. attorneys offer more lenient sentences in

exchange for early or pre-indictment guilty pleas and waivers of appellate rights.  Many

federal prosecutors have used such negotiated pleas since roughly 1994.  In 2003, Congress

formalized the practice as part of the Prosecutorial Remedies and Tools against the

Exploitation of Children Today (PROTECT) Act of 2003. (Pub L. No. 108-21)  Congress

authorized the Attorney General to set up a district-by-district fast track program and to

develop sentencing guidelines specifically for fast-track programs.  Currently, a defendant in

a fast-track district may be able to receive a lower sentence of up to four levels, than he

would in a non-fast track district. (USSG §5K3.1)  According to the Seventh Circuit as of 2008

there were 20 fast track programs in operation at district courts, and 16 of these districts

use the procedure for illegal re-entry prosecution. (LEXIS 20709, 15).

In a January 31, 2012 memo, Deputy US Attorney General James Cole directed

all US Attorneys to implement "fast track "treatment for re-entry after deportation cases.

The pertinent portions of this policy are set forth as follows[6]:

Districts prosecuting felony illegal reentry cases (8 U.S.C. § 1326)—the largest category of
cases authorized for fast-track treatment—shall implement an early disposition program in
accordance with the following requirements and the exercise of prosecutorial discretion by the
United States Attorney:

*A. Defendant Eligibility*. The United States Attorney retains the discretion to limit or deny a
defendant's participation in a fast-track program based on— (1) The defendant's prior violent felony
convictions (including murder, kidnapping, voluntary manslaughter, forcible sex offenses, child-sex
offenses, drug trafficking, firearms offenses, or convictions which otherwise reflect a history of
serious violent crime); (2) The defendant's number of prior deportations, prior convictions for illegal
reentry under 8 U.S.C. § 1326, prior convictions for other immigration-related offenses, or prior
participation in a fast-track program; (3) If the defendant is part of an independent federal criminal
investigation, or if he or she is under any form of court or correctional supervision; or (4) With
supervisory approval, circumstances at the time of the defendant's arrest or any other aggravating
factors identified by the United States Attorney.

*B. Expedited Disposition*. Within 30 days from the defendant being taken into custody on
federal criminal charges, absent exceptional circumstances such as the denial of adequate assistance

---

[6] This is taken directly from the Cole memo.

of counsel or a substantial delay in necessary administrative procedures, the defendant must agree to enter into a plea agreement consistent with the requirements of Section C, below.

   *C. Minimum Requirements for "Fast-Track" Plea Agreement*. The defendant must enter into a written plea agreement that includes at least the following items— (1) The defendant agrees to a factual basis that accurately reflects his or her offense conduct and stipulates to the facts related to the prior conviction and removal; (2) The defendant agrees not to file any of the motions described in Rules 12(b) (3), Fed. R. Crim. P.; (3) As determined by the United States Attorney after taking into account applicable law and local district court practice and policy, the defendant agrees to waive the right to argue for a variance under 18 U.S.C. § 3553(a), and to waive  appeal and the opportunity to challenge his or her conviction under 28 U.S.C. § 2255, except on the issue of ineffective assistance of counsel; and (4) The United States Attorney shall retain discretion to impose additional procedural requirements for fast-track plea agreements; specifically, the United States Attorney has discretion to require that the defendant agree to enter into a sentencing agreement pursuant to Fed. R. Crim. P. 11(c) (1) (C), and/or to waive a full pre-sentence investigation as conditions of participation.

   *D. Additional Provisions of a Plea Agreement*. If the above conditions are satisfied— including those imposed at the discretion of the United States Attorney as provided for in Section C(4)—the attorney for the Government shall move at sentencing pursuant to Sentencing Guidelines Section 5K3.1 for a downward departure from the adjusted base offense level found by the District Court (after application of the adjustment for acceptance of responsibility) as follows: Four levels for all defendants, except those with a criminal history category VI or with at least one felony conviction for a serious violent offense. For the latter category, if the defendant is not excluded under Section A(1), the government may only offer a two-level departure, with supervisory approval and on a case-by-case basis after considering the interest of public safety.

   Districts prosecuting felony illegal reentry cases should implement this new policy no later than by March 1, 2012

   While Mr. Capone is not in a border state in classic sense, his history and his case fits

fast track classification.    While it is true that Mr. Capone's case has dragged on for a while, he

was willing to leave the U.S as soon as he was indicted and the undersigned's first efforts in this

case were to attempt to negotiate such a disposition with AUSA Nathan Reilly, Esq. in this case.

Those negotiations proved unsuccessful.   Mr. Capone fully recognizes that this case ends with

him being returned to Italy.   Given that he will be taken from federal custody to the US ERO of

ICE of the DHS, the defendant moves that he be given the 4 point downward departure of its

equivalent and that the guideline amounts reflect as much.   This motion and request for a downward departure seems to be in conformity with the Cole memo now being promulgated on a nationwide basis in the federal courts.    Thus, Mr. Capone moves this court for a 4 point downward departure based upon fast track considerations.

The Department of Justice Sentencing Commission Report acknowledged that individuals in non-fast-track district receive disparate sentences.. (LEXIS 200709, 12).   Nevertheless, *U.S. v. Booker*, 543 U.S. 220, 2005 (Sentencing guidelines are advisory only), *Gall v. U.S.* 552 U.S. 38, 2007 (guidelines are not presumptively reasonable) and *Vazquez v. U.S.* 130 S. Ct. 1135 (2010)(courts do not need congressional directive in order to vary from the guidelines) all strongly point against the notion that district courts are bound to follow the guidelines. The Seventh Circuit concludes that, "If Congress wanted to prohibit judges in non-fast-track districts from disagreeing with §5K3.1 based on policy, Congress could have issued such a directive in unequivocal terminology."(LEXIS 20709, 33)  Consequently, sentencing judges are permitted to consider a facially obvious disparity created by fast-track programs among the totality of the sentencing factors considered.    The Cole memo seems to largely moot this issue by bringing fast track treatment to the federal courts on a nationwide basis.

In the Second Circuit, the court seems to acknowledge a de facto fast track guideline.   In *United States v. Ramos-Soto*, No. 08-2381-cr, 2009 WL 4255754 (2d Cir. Dec. 1, 2009)*,* is a case that simply highlights the question of whether fast-track disparity is a legitimate basis for a non-Guidelines sentence.  There, the defendant contended that the district court committed procedural error by denying his motion for a non-Guidelines sentence based on the potential

sentencing disparity arising from the absence of a fast-track program in the Eastern District of New York.  The precise contours of his argument before the district court, however, were unclear from the record.   Accordingly, the Second Circuit remanded for clarification.  In doing so, however, it noted that: (1) a decision by the district court that it "was not required to issue a non-Guidelines sentence . . . based on defendant's disparity argument" would "not necessarily be inconsistent with our previous holdings"; and (2) a decision by the district court that "it lacked authority to issue a non-Guidelines sentence . . . remains the subject of an open question in this Circuit."

Likewise, in *United States v. Ramirez*, No. 09 Cr. 751 (RWS), 2009 WL 4722237 (S.D.N.Y. Dec. 4, 2009)  Ramirez was convicted of illegal re-entry after deportation following conviction for criminal sale of a controlled substance in the second degree, for which he faced an advisory Guidelines range of imprisonment of between 41 and 51 months.  He was sentenced, however, to only 18 months imprisonment because: (1) of the disparity in the sentences imposed for illegal re-entry cases in jurisdictions that have and that do not have fast-track programs; and (2) his advisory Guidelines range "double counts his criminal history, using his prior convictions not only to enhance his criminal history category but also to increase his offense level threefold."  Indeed, the court noted that there's no sense in increasing a defendant's penalty "twice" based on prior criminal conduct -- a practice that is arbitrary.

Mr. Capone faces the same draconian situation in that his very old controlled substance conviction from 24 years ago essentially doubles his guideline calculation and the failure of the court to provide him fast track treatment harms him from the perspective of his guideline

reduction.  Accordingly, Mr. Capone moves for a downward departure to secure a 4 point downward departure under the USSG.

In *United States v. Gutierrez-Hernandez*, No. 08 Cr. 1335-01 (RWS), 2009 WL 812265 (S.D.N.Y. March 26, 2009), the court looked at the appropriate adjustment to account for the disparity in Guidelines offense levels for illegal re-entry cases between those jurisdictions that have and those that don't have fast-track programs.  The court concluded a 4 point downward departure is the appropriate standard -- a 4 level downward adjustment, that is, to account for fast track disparity.  In determining the non-Guidelines sentence to be imposed in this case, it is appropriate to consider how other courts have approached the fast-track disparity issue.

Mr. Capone's believes that in light of the Cole memo and given his history and the procedural history of this case that he be given a 4 point downward departure from the advisory guidelines consistent with the Cole memo and with Fast Track treatment.   Mr. Capone recognizes this plea was not entered at the earliest of possible opportunities and that he does have a criminal history of very old vintage but the spirit of fast track treatment nonetheless should apply.

12.     For each of the reasons set forth above, the defendant Capone urges this court to fashion a time served sentence.


                                        Respectfully submitted,


                                        _____

                                        John T. Riely

                                        4405 East West Highway

                                        #601

                                        Bethesda, Md. 20814

                                        (301)656-3382

                                        jtriely@msn.com